## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

TRAX INTERNATIONAL CORPORATION )
)
)
*Plaintiff,*                )
)
)
v.                          )
)
DEPARTMENT OF THE ARMY       )
)
*Defendant.*                )
)
)

Case No. _____

Judge _____

███████████████████

### COMPLAINT

Plaintiff TRAX International Corporation ("TRAX") files this Complaint to protest the decision by the Department of the Army to award a contract to Southwest Range Services, LLC ("SRS") under Solicitation No. W51EW7-25-RA003 (the "Solicitation" or "RFP") for Mission Support Services ("MSS") at White Sands Missile Range ("WSMR"). As discussed below, the Army's evaluation and its decision to award the contract to SRS were arbitrary, capricious, an abuse of discretion, and not in accordance with law. TRAX respectfully requests that the Court issue a permanent injunction directing the Army to properly reevaluate the proposals before making a new source selection.

### NATURE OF THE ACTION

1.    This action is a post-award bid protest challenging the Army's evaluation of proposals under the RFP and the Army's selection of SRS for the award of the WSMR MSS contract.

1

## JURISDICTION & STANDING

2.    This Court has jurisdiction over this bid protest pursuant to 28 U.S.C. §1491(b)(1).

3.    TRAX has standing to bring this bid protest because TRAX is an actual offeror that submitted a timely proposal under the RFP and was among the offerors considered for award. If the Government were to evaluate proposals in a reasonable manner and in accordance with the RFP's stated evaluation criteria, TRAX would have a substantial chance of award. As such, TRAX's direct economic interests have been impacted by the award of the contract to SRS and by the procurement errors identified below.

## PARTIES

4.    TRAX is a corporation organized under the laws of the State of New Mexico, with its corporate headquarters and principal place of business at 8337 W. Sunset Rd, Suite 190, Las Vegas, Nevada, 89113-2201.

5.    Defendant is the United States of America, acting by and through the Army, an agency of the Federal Government.

## FACTUAL BACKGROUND

**A.    The Solicitation**

6.    The Army issued the RFP on May 23, 2025, pursuant to the negotiated contracting procedures of Federal Acquisition Regulation ("FAR") part 15 and amended it three times.

7.    As explained in the RFP, WSMR is the largest open-air land test range in the Department of Defense ("DOD" or "DOW"), with a large land mass and controlled airspace that

allow for the testing and analysis of conventional munitions, unmanned systems, distributed testing, countermeasures, space systems and sensors, directed energy, high and low altitude missile systems testing, explosives testing, ground and aerial target flights, and low observable precision strikes. Exhibit 3, Performance Work Statement ("PWS") at 1.

8. The RFP sought proposals for the provision of engineering support services to the White Sands Test Center, which is a tenant on WSMR, in support of experimentation, test, research, assessment, development, and training in support of national security. *Id.* at 1-2.

9. The RFP contemplated award of a single cost-plus-fixed-fee contract with a 3-month phase-in period, 9-month base period, four 12-month option periods, and a 6-month option to extend services.

10. The RFP provided for award of the contract on a tradeoff basis to the offeror whose proposal presented the best value to the Army considering four factors: (1) mission capability; (2) past performance; (3) small business participation; and (4) cost/price. Ex. 5, RFP Section M at 1.

11. The mission capability factor comprised two subfactors: management and staffing and continuity of operations. *Id.* Within the mission capability factor, the management and staffing subfactor was significantly more important than the continuity of operations subfactor. *Id.* The mission capability factor itself was significantly more important than the past performance factor, which, in turn, was more important than the small business participation factor. *Id.*

12. All of the non-cost/price factors, when combined, were significantly more important than cost/price. *Id.*

13.    For the management and staffing subfactor under the mission capability factor, the RFP instructed offerors to submit key personnel resumes, an organizational and management structure description, and a plan for workforce recruitment and retention. Ex. 4, RFP Section L at 6-7.

14.    With respect to organizational and management structure, offerors were to provide an organizational flow chart demonstrating teaming arrangements, functional and supervisory lines of control, and roles and responsibilities needed to successfully execute the agency's requirements. *Id.* at 6.

15.    Additionally, offerors were to describe their approach to prime and subcontractor integration, decision-making, workload responsibilities, and problem resolution. *Id.*

16.    With respect to recruitment and retention, offerors were to describe their ability to react to surge requirements and to detail how they intended to staff with specialized personnel on short notice. *Id.* at 7.

17.    Similarly, the RFP directed offerors to detail their approach to staffing fluid requirements, where workload demands could increase or decrease unpredictably. *Id.*

18.    For the continuity of operations subfactor under the mission capability factor, the RFP instructed offerors to submit a transition plan meeting the requirements of the PWS and an approach for minimizing disruption of operations due to contract transition and assumption of workload. *Id.*

19.    Specifically, offerors were to describe their approach to assuming contractual responsibility without disruption or degradation of performance, including the identification of risks and proposed mitigation strategies. Ex. 4, RFP Section L at 7.

20.    Additionally, they were to describe their staffing plan for the phase-in period, identifying qualified resources on hand to begin immediate performance as well as their approach to ensuring availability of trained and qualified personnel. *Id.*

21.    The RFP further directed offerors to describe their approach for realignment of incumbent personnel to minimize interruptions and delays, as well as how they proposed to capture efficiencies in knowledge and workload transfer to ensure successful performance during the phase-in period. *Id.*

22.    Offerors also were to provide information regarding property management, including the management of government property. *Id.*

23.    The RFP stated that the Army would evaluate proposals under the mission capability factor, including its subfactors, to determine the extent to which the offeror demonstrated a clear understanding of the Army's requirement, the technical quality of the proposed approach, and the offeror's ability to fulfill the requirements of the PWS and meet performance criteria. Ex. 5, RFP Section M at 4.

24.    The RFP further explained that the Army would evaluate the extent to which the offeror identified uncertainties and proposed resolutions to them, as well as the degree to which the offeror provided a logical and effective approach for providing personnel and meeting compliance requirements necessary to properly execute contract requirements. *Id.* at 4-5.

25.    With respect to the past performance factor, the RFP instructed offerors to submit information regarding up to five government contracts performed within 5 years of issuance of the RFP. Ex. 4, RFP Section L at 8.

26.    The RFP provided that the Army would assess the recency, relevancy, and quality of performance of each effort, and assign a performance confidence assessment rating on the basis of that evaluation.  Ex. 5, RFP Section M at 7-8.

**B.    Award to SRS**

27.    The Army received three timely proposals, including from TRAX and SRS.

28.    The Army evaluated the proposals submitted by the protester and SRS as follows:

|  | TRAX | Southwest Range |
|---|---|---|
| **MISSION CAPABILITY** | Blue/Outstanding | Blue/Outstanding |
| **Management and Staffing** | Blue/Outstanding | Blue/Outstanding |
| **Continuity of Operations** | Purple/Good | Blue/Outstanding |
| **PAST PERFORMANCE** | Substantial Confidence | Substantial Confidence |
| **SMALL BUSINESS PARTICIPATION** | Blue/Outstanding | Blue/Outstanding |
| **COST/PRICE** | $419,992,258 | $449,372,096 |

Ex. 10, Source Selection Decision Document ("SSDD") at 14.

29.    In comparing the two proposals, the Army's Source Selection Authority ("SSA") acknowledged that both had received ratings of outstanding under the mission capability factor, but concluded there was a meaningful distinction between the two.  Ex. 10, SSDD at 37.

30.    The SSA noted that Southwest Range's proposal had received two significant strengths and four strengths under the management and staffing subfactor, as compared to one significant strength and two strengths for the protester's proposal.  *Id.*

31.    Similarly, SRS's proposal had received three significant strengths under the continuity of operations subfactor, as compared to two strengths and one weakness for the protester's proposal.  *Id.*

32.    The SSA further found that "[t]he details of [Southwest Range's] [s]trengths and [s]ignificant [s]trengths were notable[,]" highlighting examples in support of the SSA's

conclusion that SRS's proposal was technically superior under the mission capability factor. *Id.* at 38-39.

33.     The SSA also concluded that there was "no meaningful distinction" between the two proposals under both the past performance and small business participation factors. *Id.* at 39.

34.     The SSA recognized that the protester's total evaluated cost/price of $419,992,258 was $29,379,878, or approximately 6.5 percent, lower than SRS's total evaluated cost/price of $449,372,096, but concluded that the technical superiority of SRS's proposal justified the price premium. Ex. 10 at 39-40.

35.     In doing so, the SSA noted the significantly greater importance the RFP placed on the mission capability factor, as well as the significantly greater importance of the non-cost/price factors when compared to cost/price. *Id.* at 41.

36.     The SSA therefore concluded that SRS's proposal represented the best value to the agency, and awarded the contract to SRS. *Id.*

37.     TRAX protested the Army's decision at the GAO on February 17, 2026.

38.     GAO denied TRAX's protest on May 14, 2026. *See* Ex. 1, GAO Decision.

## CLAIMS FOR RELIEF

### COUNT I
### SRS Is Ineligible for Award Because It Does Not Possess an Adequate Accounting System

39.     Under FAR 16.301-3(a)(3), a cost-reimbursement contract may be awarded only when "[t]he contractor's accounting system is adequate for determining costs applicable to the contract or order." (Emphasis added). *Accord* FAR 16.104(i) ("Before agreeing on a contract type other than firm-fixed-price, the contracting officer shall ensure that the contractor's

accounting system will permit timely development of all necessary cost data in the form required by the proposed contract type." (Emphasis added)).

40.     To that end, the RFP stated: "The prime Offeror shall provide evidence to support that it has an adequate accounting system for the purposes of administering a cost-type contract." Ex. 4 at 12 ¶ L.7.1.

41.     Moreover, the RFP expressly stated: "Failure to provide a proposal in compliance with the instructions specified in this RFP shall render the Offeror's proposal non-compliant, resulting in the Offeror no longer being eligible or considered for award." *Id.* at 2 ¶ L.3.

42.     The RFP also incorporated DFARS 252.242-7006, which similarly requires the awardee to possess an "acceptable accounting system." Ex. 2, Request for Proposals ("RFP") at 35. DFARS 252.242-7006(a) makes clear that an "'[A]ccounting system' means the Contractor's system or systems for accounting methods, procedures, and controls . . . ." (Emphasis added).

43.     The RFP therefore clearly identified an adequate accounting system as a threshold requirement for the evaluation of proposed cost for this procurement of a $400+ million cost-reimbursement contract.

44.     SRS does not have an accounting system, let alone an acceptable accounting system under the FAR, DFARS, and the RFP.

45.     At the time of proposal submission, ███████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 8, SRS Proposal Volume IV at 5-6.

████████████████████████████████

46.    SRS stated in its proposal that █████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████    Ex. 8 at 5.

47.    SRS further stated:    ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████    *Id.* at 6.

48.    On information and belief, neither DCAA nor any other cognizant Federal agency has determined that SRS has an adequate accounting system.

49.    SRS is a populated joint venture that SRS ███████████████████

████████████████████████████    *Id.* at 2.  SA-TECH is one of the three members of the SRS Joint Venture. *Id.* at 1.

50.    In response to the requirement in the FAR, DFARS, and the RFP for evidence of an adequate accounting system, SRS ██████████████████████████

████████████████████████████    *Id.* at D-2.  ████████████████

██████████████████████████████████████████████████████████

████████████    *Id.*

51.    SRS's Cage Code is 7YXE0, Ex. 10 at 1, which is consistent with ██████

██████████████████████████████████████████████████████████

████████████████████████, Ex. 8 at 1.

52.    Moreover, all of the relevant FAR and DFARS provisions focus on "the contractor's" accounting system—not the accounting system of some other entity. *See* FAR 16.301-3(a)(3) (a cost-reimbursement contract may be awarded only when "[t]he contractor's accounting system is adequate for determining costs applicable to the contract or order"



9

██████████████████████████████████████████████████████████

████████████████

(Emphasis added)); *accord* FAR 16.104(i) ("Before agreeing on a contract type other than firm-fixed-price, the contracting officer shall ensure that <u>the contractor's</u> accounting system will permit timely development of all necessary cost data in the form required by the proposed contract type." (Emphasis added)); DFARS 252.242-7006 (requiring that, "[t]he Contractor shall establish and maintain an acceptable accounting system," and defining an "accounting system" as "<u>the Contractor's</u> system or systems for accounting methods, procedures, and controls") (Emphasis added).

53.    SRS is not ███████, and ███████ will not be the "contractor" for the WSMR MSS Contract under FAR 16.301-3 or DFARS 252.242-7006.

54.    Because SRS does not have an adequate accounting system as required by the RFP, the FAR, and the DFARS for this $400+ million cost-reimbursement contract, SRS is ineligible for award.[1]

## COUNT II
### The Army's Technical Evaluation Was Arbitrary and Capricious and Distorted by Multiple "Hallucinations" that Create a False Appearance that SRS's Proposal Is Technically Superior to TRAX's

55.    TRAX incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

---

[1] TRAX raised this protest ground in its GAO protest, but GAO ruled that it did not have jurisdiction to consider this argument. Ex. 1 at 5 n.1. GAO reasoned that a determination that a contractor has an adequate accounting system concerns a matter of the contractor's responsibility, not technical acceptability, and GAO concluded that it did not have jurisdiction to consider TRAX's protest ground under 4 C.F.R. § 21.5(c), which limits GAO's jurisdiction over protests challenging affirmative determinations of responsibility. GAO did not explain why TRAX's allegations did not satisfy Section 21.5(c) of GAO's rules. Regardless, this Court is not constrained by the limitations in GAO's rules.

56.     The Army's decision to pay a $29.4 million cost/price premium for SRS's proposal was based on numerous evaluation findings under Factor 1, Mission Capability, and Factor 2, Past Performance, that are arbitrary, capricious, inconsistent with the RFP, and not in accordance with procurement law.

57.     On information and belief, the errors in the Army's Factor 1, Mission Capability, evaluation stem from the Army's overreliance on an Artificial Intelligence ("AI") tool to evaluate proposals.

58.     Before GAO, the Army all but admitted that it used AI to evaluate proposals in the first instance. In response to TRAX's request for information regarding the Army's use of AI in the evaluation, the Army pointed to Section M.3 of the RFP, which reserved the Army's right to use AI in evaluating proposals, including by "highlighting areas of potential strength, weakness, and risk." Ex. 5 at 2.

59.     The Army asserted that the "The SSA did not use or rely on AI for the evaluation of offeror's proposals," but refused to say whether the Source Selection Evaluation Board ("SSEB") used or relied on AI for the evaluation of offerors' proposals. This is critical because the record that the Army produced to GAO demonstrates that the SSA simply adopted the strengths, weaknesses, and other findings identified in the SSEB's report.

60.     The record produced to GAO therefore does not explain whether the strengths assigned to SRS and challenged by TRAX were identified by a member of the SSEB or the Army's AI tool. This Court, of course, defers to agency judgments and discretion, not algorithms.

61.     TRAX alleges the following for examples of errors in the Army's Factor 1, Mission Capability, Evaluation. TRAX challenges the entire evaluation under Factor 1, and

reserves the right to seek judgment on the Administrative Record based on other errors, once the

Army produces a complete administrative record of its evaluation.

**A.      The Army Unreasonably Evaluated TRAX's Proposal Under Subfactor 1B, Assigning TRAX a Weakness Based on a Misstatement of TRAX's Proposal that Appears to be an AI-Generated Hallucination.**

62.      The Army assigned TRAX the following weakness under Subfactor 1B,

Continuity of Operations:



Ex. 10 at 23.

63.      The Army conceded that this weakness was not supported by the record. Ex. 1 at

13. The Army did not, however, explain how the error occurred.

64.      The weakness appears to be a classic AI hallucination, with made-up references to

TRAX's proposal, that no one on the SSEB checked before sending the SSEB Report to the

SSA.

65.      Pages 32-38 of TRAX's proposal, which are the pages referenced in the

weakness, contain TRAX's response to Subfactor 1A, not Subfactor 1B. TRAX's response to

Subfactor 1B was set forth in pages 49-74 of TRAX's proposal.

66.      "Mirroring" is referenced once in TRAX's proposal, on page 32, as part of

TRAX's response to Section ███████ of the RFP—not M.4.1.3.3., as referenced in the

weakness.

67.     Given the $29.4 million price premium associated with SRS's proposal, there is a reasonable possibility that the removal of this Weakness could have changed the award decision. *See, e.g., Cadre5, LLC*, B-422616, Aug. 28, 2024, 2024 CPD ¶ 204 (resolving doubts regarding prejudice in favor of the protester on "a reasonable possibility of prejudice," where GAO could not "say what impact even just one technical evaluation error would have had on the best-value decision").

68.     Regardless, the inexplicable nature of this erroneously assigned weakness calls into question other evaluation findings that similarly cannot be supported by the record.

**B.    The Army Improperly Assigned SRS a Significant Strength for Proposing a Government-Owned System, PCMS, that Offerors Were Required to Use.**

69.     The Army assigned SRS the following Significant Strength for proposing to leverage the Government's Project Cost Management System ("PCMS") and various applications that SRS integrated with PCMS:

> Significant Strength (RFP L.4.1.2.3, M.4.1.3.3, PWS 1.20.2, Proposal pg. 7; Finding C09) The Offeror demonstrated a superior approach to realignment of incumbent personnel potentially minimizing interruption of services to reduce risk of impact to the overall mission which includes; leveraging integrated digital systems such as the Project Cost Management System (PCMS) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; centralized Standard Operating Procedures (SOP) libraries, and ▮▮▮▮▮▮ (the system SRS utilizes for all training), earning this Offeror a Significant Strength. This reduces the need for system migrations or process adoptions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ capturing efficiencies of uninterrupted execution of mission-critical functions.

Ex. 10 at 29.

70.     This Significant Strength was identified by the SSEB and repeated nearly verbatim in the SSDD.  The SSA highlighted this Significant Strength in his tradeoff decision,

repeating the assertion that the ███████████████████████████████████████ ████████████████ capturing the efficiencies of uninterrupted execution of mission-critical functions." *Id.* at 38.

71.     PCMS, however, belongs to the Army and resides entirely on Government-owned hardware, so there will be no "system migration" of PCMS from SRS to TRAX:

> 1.27.2 FINANCIAL TRACKING AND REPORTING.
>
> The Contractor shall utilize Government-provided software and hardware to maintain an automated web-based financial tracking and approval system to meet requirements within the PWS. The current software is Microsoft Power Automate, Microsoft Power BI, Microsoft Office 365 (SharePoint, Access, Word, PowerPoint, Excel) but may include any other software the Government has licenses. The Government refers to this tracking program as a Project Cost Management System (PCMS). The software and hardware provided by the Government may change to adapt to changing technology.
>
> The Contractor shall develop workflows within the system to route approvals for work requests, work request modifications, travel, overtime, purchases, and maintenance actions. The Government may request workflow changes as required.
>
> The Contractor shall provide training on the workflows in PCMS to Government personnel requiring access to the system. Training shall be provided as workflow changes are required and are made to PCMS.
>
> The Contractor shall track, maintain, and display the cost reporting information, support documentation, and status within the PCMS for work requests, work request modifications, travel, overtime, purchases, and maintenance actions. This system allows the Government to have live/real time record of all Contractor-incurred costs allocated for each mission, test, or activity occurring on the contract. The COR and/or the KO will provide to the Contractor a list of the designated Government personnel requiring access thirty (30) days after contract start and update as necessary thereafter.

Ex. 3, PWS at 23.

████████████████████████████████████████████████████████████████

72.    Given that the Government owns and provides PCMS, and that PCMS runs on Government-owned and Government-provided hardware, it makes no sense to suggest that anyone other than SRS could not "preserve" PCMS or that anyone other than SRS would require "months" to migrate or adopt PCMS.

73.    In response to TRAX's protest, the Army attempted to rewrite the significant strength Army assigned to SRS, and GAO accepted the Army's restatement of its evaluation.

74.    Although PCMS was the first system cited in the assigned significant strength, the Army and GAO suggested instead that the strength was based on SRS's "centralized Standard Operating Procedures (SOP) libraries" and "███████ (the system SRS utilizes for all training)." Ex. 1 at 12-13.

75.    The Army's and GAO's attempt to rewrite the significant strength assigned to SRS ignores the last, most important sentence used by the Army to explain its evaluation: "PCMS ████████████████████████████████████ ████████████████████████ capturing efficiencies of uninterrupted execution of mission-critical functions." Ex. 10 at 29.  Clearly, the Army assigned SRS a significant strength for preserving PCMS, a Government-owned system.

76.    Even if the strength was based on SRS's "Standard Operating Procedures (SOP) libraries" or "███████ (the system SRS utilizes for all training)," the Army's finding could not be supported for the same reason:  The Army owns SRS's SOPs and training materials so there is nothing that will be ███████ by an award to SRS that will not be ███████ by an award to TRAX.

77.    PWS Sections 1.20.4 and 1.20.6 require the outgoing contractor to transfer all "SOPs" and "training documents" to an incoming contactor. Ex. 3 at 16, 17.  To the extent that

the current library of SOPs and training materials is integrated with PCMS, it will be transferred

with that integration intact, as the SOPs, like PCMS, reside on Government-owned IT systems

and devices. As with PCMS, it makes no sense to suggest that anyone other than SRS could not

████████████ the SOPs or training materials, or that anyone other than SRS would require

████████████ to migrate or adopt the SOPs or training materials.

78.    Section 1.26.6 similarly requires the contractor to "maintain, and archive for

Government review and retrieval, such knowledge management tools as . . . SOPs, to include on-

the-job aides and knowledge transfer aids," and requires SRS to provide these documents upon

request. *Id.* at 21. These resources are maintained for on-demand use on Government-owned IT

systems and devices and will remain in that status regardless of whether SRS or TRAX is the

next contractor.

79.    However the Army tries to rewrite this significant strength, the record

demonstrates that the Army credited SRS for possessing systems and information that the

Government owns, and that will be available in the same format, on the same IT systems, to the

successor contractor.

**C.    The Agency Improperly Assigned SRS a Significant Strength for its Teaming and Management Structure Under the Management and Staffing Subfactor.**

80.    The Army assigned SRS the following Significant Strength for its teaming and

management structure:

> Significant Strength (RFP L.4.1.1.2; M.4.1.2.2; Proposal pg. 8, 12, 14-33;
> Finding C05) The Offeror's proposed superior teaming and management
> structure will potentially lead to more efficient decision making due to the
> minimal and streamlined layers of management one needs to request/route
> work approval through. This will potentially result in streamlined mission
> performance and minimal work delays, reducing risk for the Government,
> earning this Offeror a Significant Strength. The management structure has
> a superior rationale for the Offeror's organizational design to successfully
> perform the WSMR MSS PWS requirements.

AR Tab 38 at 28.

81.    The record that the Army produced at GAO does not support that SRS proposed a "teaming and management structure." To the contrary, the record demonstrated that TRAX proposed a smaller, more efficient Program Management Office than SRS. Ex. 1 at 11.

82.    The Army failed to provide a coherent explanation for the assigned significant strength.

83.    GAO, for its part, found the significant strength to be reasonable based solely on "a comparison of the organizational charts contained in the offerors' proposals." Ex. 1 at 11. No such comparison exists in the Army's contemporaneous evaluation record.

84.    According to GAO:

> Southwest Range's organization chart shows that all of the departments responsible for the substantive requirements of the contract report directly to the program manager. This reasonably supports the agency's conclusion that Southwest Range's organizational and management structure minimized layers of approval to expedite decisions and reduce performance delays. By contrast, the protester's organizational chart shows several such departments reporting first to the deputy program manager and then to the program manager. The protester's proposed organizational structure thus interposes an additional management layer not present in Southwest Range's proposal.

Ex. 1 at 11-12.

85.    GAO did exactly what GAO repeatedly says it will not do—"reevaluate proposals." *See, e.g.,* Ex. 1 at 9 ("In reviewing a protest challenging an agency's evaluation, our office will not reevaluate proposals . . . ."). A review of the RFP and the organization charts cited by GAO shows why GAO does not reevaluate proposals.

86.    The PWS identified two required key personnel, a Program Manager ("PM") and a Deputy Program Manager ("DPM"). Ex. 3 at 10-11, ¶ 1.10. Both the PM and DPM were

required to "have full authority to act for the Contractor on all contract matters relating to daily operations of this contract." *Id*. at 11, ¶ 1.10.

87.    GAO inexplicably interpreted TRAX's organization chart to suggest that TRAX's DPM does not have full authority to act for TRAX on all matters related to daily operations of the contract.  Putting aside that the Army made no contemporaneous finding to that effect, GAO's reasoning ignores the express statements in TRAX's proposal that both TRAX's PM and DPM have that authority.  Ex 6 at 31.

88.    Although TRAX's organization chart identifies several departments as reporting to TRAX's DPM, it makes no sense to suggest that this involves "an additional management layer" if the DPM has "full authority to act for the Contractor on all contract matters relating to daily operations." Ex. 3 at 11 (RFP requirement); Ex 6 at 31 (stating that TRAX's proposed DPM will "maintain full authority for contract execution").

89.    GAO's statement that SRS's organization chart, by contrast, "shows that all of the departments responsible for the substantive requirements of the contract report directly to the program manager," is also incomplete.  Ex. 1 at 11-12.

90.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 7, SRS Proposal at 13.

91.    ████████████████████████████████████████████████████████████████████████

92.    The Agency's assignment of a significant strength to SRS was therefore arbitrary and capricious.

**D.      The Agency Improperly Assigned SRS a Strength for its use of ███████████.**

93.     The Army assigned SRS a strength for its use of ██████████ under Subfactor 1A, Management and Staffing Plan.  Ex. 10 at 28.

94.     Although the strength assigned to SRS uses the plural, ███████████ ████████████████████████████████████████████████ ██████████████████.  *Id.*

95.     In its assignment of this strength, the SSDD cites RFP Section M.4.1.2.3 as the relevant evaluation criterion.  *Id.*

96.     Section M.4.1.2.3 states that an Offeror's proposal would be evaluated on its "ability to react to surge requirements and how it intends to staff the requirement with specialized personnel on short notice, and its approach in staffing fluid requirements where workload demands increase/decrease unpredictably."  Ex. 5 at 5.

97.     The RFP also stated that the evaluation would consider "the Offeror's proposed plan to recruit and retain a workforce possessing the unique and critical skills needed to successfully perform the requirements of the PWS, with an emphasis on PWS Part 5, Specific Tasks."  *Id.*

98.     The RFP's Section L.4.1.1.3 requirements were nearly identical to the language in Section M.4.1.2.3.  *See* Ex. 4 at 7.

99.     These RFP sections do not suggest that the use of innovative technologies were a consideration.  Subfactor 1A, by its terms, is limited to the offeror's "plan to recruit and retain a workforce."  Ex. 5 at 5.  Subfactor 1A does not encompass technology and tools, let alone undefined ████████.

100.    Moreover, SRS did not mention ███ explicitly in its recruitment and retention section of its proposal. *See* Ex. 7 at 40-55.

101.    The Agency's assignment of a strength to SRS for its use of ████████ was arbitrary and capricious and otherwise inconsistent with the RFP.

**COUNT III**
**The Army's Past Performance Evaluation Was Arbitrary and Capricious and Improperly Credited SRS with the Past Performance of Unrelated Entities**

102.    TRAX incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

103.    The Army's determination that there was "no meaningful distinction between TRAX and SRS within the Past Performance Factor" was entirely without merit. Ex. 10 at 39.

104.    The RFP instructed offerors to submit information regarding up to five Government Contracts performed within five years of issuance of the RFP. Ex. 4 at 8.

105.    The RFP further provided that the Army would assess the recency, relevancy, and quality of performance of each effort, and assign a performance confidence assessment rating on the basis of that evaluation. Ex. 5 at 7-8.

106.    The RFP advised that only contracts performed by the "Prime Offeror" would be considered. Ex. 4 at 7 ("This volume shall contain past performance information regarding recent and relevant contracts of the Prime Offeror only."); Ex. 5 at 7 ("Only the prime Offeror will be assessed, evaluated, and provided a past performance rating.").

107.    SRS submitted four contract references with its proposal; however, only one of those contract references reflects SRS's own work. The three other contract references submitted by SRS were not performed by SRS, nor were they even performed by one of SRS's

JV members. Rather, each reference was performed by some sort of affiliate of one of SRS's JV members:

     a.   ████████████████████████████████████ was performed by Reliance Test & Technology, LLC ("RT&T")—a JV between Amentum and InDyne, Inc., with SA-TECH as a subcontractor. Ex. 9, Past Performance Evaluation at 122.

     b.   ████████████████████████████████████ was performed by JT4, LLC—a wholly owned subsidiary of Amentum. *Id.* at 130.

     c.   ████████████████████████████████████ was performed by TEST, LLC—a JV with EWA and SA-TECH. *Id.* at 147.

108.    The Army, however, fully credited SRS with these past performance references, making no distinction among them in terms of their relevancy to this procurement.

109.    As GAO explained: "While it is appropriate to consider an affiliate's performance record where the affiliate will be involved in the contract effort or where it shares management with the offeror, it is inappropriate to consider an affiliate's record where that record does not bear on the likelihood of successful performance by the offeror." Ex. 1 at 15 (citing *Systems Eng'g Partners, LLC*, B-412329, B-412329.2, Jan. 20, 2016 at 5). This Court makes the same distinction. *See, e.g., Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 747 (Fed. Cl., 2008) (adopting GAO's "sound and reasonable approach to analyzing an offeror's use of parent and affiliate corporations in its proposal" and stating: "An agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror.").

110. ██████████████████████████████████████████

███████████

111. Indeed, SRS ███████████████████████████████

████████████████████████. SRS's proposal █████████████████

█████████████████████████. And, in response to TRAX's organizational conflict of

interest allegations, SRS emphasized that it is a stand-alone, populated joint venture and ████

████████████████████████████████████:



Ex. 11, Contracting Officer's OCI Investigation at 31 (Declaration of ████████████).

112. █████████████████████████████████████████

██████████, it was improper for the Army to credit SRS with the past performance of

these entities.

113. But that is what the Army did. The Army concluded that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████. Ex. 10 at 30-31.

114. ████████████████████████████████████

████████████████████████████████████████

█████████████████████████████. *Id.* at 31.

████████████████████████████████████████████████

115.    The Army's past performance evaluation added up the total number of Contractor Performance Assessment Reporting System ("CPARS") ratings received by SRS, RT&T, JT4, and TEST and presented those sums in the following table:



Ex. 10 at 32.

116.    Based on the aggregation of SRS's, RT&T's, JT4's and TEST's past performance, the Army determined that there was "no meaningful distinction between TRAX and SRS within the Past Performance factor":

> I have independently reached the decision that TRAX was assessed a Substantial Past Performance Confidence rating due to the high expectation of successful performance based on ▮▮▮▮▮▮ ▮▮ reference submissions. SRS was assessed a Substantial Past Performance Confidence rating due to the high expectation of successful performance based on ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ TRAX had a highly rated very relevant effort in the Yuma Proving Ground (YPG) Mission Test Support Services (MTSS) contract reference. SRS had a highly rated very relevant effort in the WSMR MSS contract reference. I found no meaningful distinction between TRAX and SRS within the Past Performance factor.

*Id.* at 39.

117.    The record is clear that the Army's finding that TRAX and SRS were substantially equivalent under the Past Performance factor is premised on the aggregation of SRS's one past performance reference with the references and CPARS ratings for RT&T, JT4, and TEST.

118.    Had the Army not credited SRS with the past performance of distant affiliates ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the Army would have

concluded that TRAX had more very relevant past performance, and that TRAX's performance

was objectively superior to SRS's performance on SRS's only relevant contract.

119.    In denying TRAX's protest, GAO avoided addressing whether the Army properly

credited SRS with the past performance of RT&T, JT4, and TEST. Ex. 1 at 14-15.

120.    Instead, GAO performed its own evaluation of TRAX's performance under the

YPG MTSS contract and SRS's performance under the WSMR MSS contract. *Id.*

121.    Although GAO acknowledged that TRAX "received more 'exceptional' CPARS

ratings for the Yuma Proving Ground contract than Southwest Range did for the incumbent

contract," GAO assessed "the record nevertheless reflects positive reviews for both offerors." *Id.*

at 14.

122.    GAO's analysis is riddled with errors. It completely disregards that TRAX had a

second, "very relevant" past performance reference, whereas SRS only had one. Ex. 10 at 39. It

incorrectly states that SRS received a recent past performance questionnaire for its one contract

reference that was "uniformly excellent"—the PPQ in fact ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮. And GAO never explains why a higher number of exceptional CPARS ratings is not a

"meaningful distinction."

123.    Regardless, even without these errors, GAO was not permitted to substitute its

evaluation of TRAX's and SRS's past performance for one that the Army never performed. *See,*

*e.g.*, Ex. 1 at 9 ("In reviewing a protest challenging an agency's evaluation, our office will not

reevaluate proposals . . . ."). Once it was clear that 75% of the past performance that the Army

credited SRS with was not relevant past performance that could be attributable to SRS's WSMR

MSS proposal, GAO should have sustained TRAX's protest so that the Army could perform a proper evaluation consistent with the RFP and applicable law.

124.    There is a substantial chance that, without the Factor 2 credit that SRS received for entities that will have no role in contract performance, particularly in combination with the other errors alleged in this Complaint, the Army would not have elected to pay the $29.4 million price premium associated with SRS's proposal.

**COUNT IV**
**The Army's OCI Investigation was Incomplete and the Army's Conclusions were Arbitrary, Capricious, and Contrary to the Evidence**

125.    TRAX incorporates by reference and re-alleges the allegations in the preceding paragraphs of this Complaint as though fully set forth in this Count.

126.    The RFP recognizes that the testing and evaluation services to be performed under the WSMR MSS Contract entail considerable impaired objectivity OCI risk.  To that end, the PWS imposes an ongoing obligation on the WSMR contractor to notify the Army of any potential OCI, and warns that the Army may prohibit the contractor from further participation:

> Organizational Conflict of Interest (OCI): Contractor and subcontractor personnel performing work under this contract may . . . perform evaluation services which may create a current or subsequent OCI as defined in FAR Subpart 9.5. The Contractor shall notify the KO immediately whenever it becomes aware that such access or participation may result in any actual or potential OCI and shall promptly submit a plan to the KO to avoid or mitigate any such OCI. The Contractor's OCI Mitigation Plan will be determined to be acceptable solely at the discretion of the KO. In the event the KO unilaterally determines that any such OCI cannot be satisfactorily avoided or mitigated, the KO may affect other remedies as he or she deems necessary, including prohibiting the Contractor from participation in subsequent contracted requirements which may be affected by the OCI.

Ex. 3 at 15-16 § 1.19.

127. White Sands Test Center ("WSTC") is home to "state-of-the-art" testing and data collection facilities, and supports the testing of "conventional munitions, unmanned systems, distributed system, countermeasures, space systems and sensors, directed energy, high and low altitude missile systems, explosives testing, ground and aerial targets flights, and low observable precision strikes to ensure military readiness and training events." *See* U.S. Army White Sands Test Center, available at https://home.army.mil/wsmr/unitstenants/white-sands-test-center.

128. The WSMR MSS contractor, in turn, is responsible for performing precisely these tests.

129. Section 5.2 of the PWS outlines requirements for testing open-air operations support systems, and Tables 5.1 and 5.2 list general and specific requirements for pre-operational activities, test day requirements, real-time operation requirements, and post-operational activities. Ex. 3 at 57-69.

130. Section 5.3 of the PWS further outlines requirements related to operation and maintenance of various test facilities and equipment, noting that WSMR maintains over 60 unique test capabilities, spanning a wide variety of systems and their component subsystems. *Id.* at 70-79.

131. For example, one set of testing services involves the Center for Countermeasures ("CCM")—a joint activity that "supports tri-services countermeasure/counter countermeasure" solutions, and "directs, coordinates, supports and conducts independent corrective maintenance/counter-corrective maintenance T&E and training activities of U.S. and/or foreign weapon systems, subsystems, sensors, and related components producing independent corrective maintenance assessments." *Id.* at 84-89 § 5.6.

132.    SRS is a joint venture ("JV") between of Systems Application & Technologies, Inc. ("SA-TECH"), Amentum, and EWA Warrior Services, the latter of which is part of Electronic Warfare Associates ("EWA"), itself a subsidiary of Sigma Defense. *See* Southwest Range Services "Who Are We," available at https://srs-jv.com/southwest-range-services-llc-srs/; "Driving Innovation: Sigma Defense Expands CJADC2 Capabilities with EWA Acquisition," Sigma Defense Press Release (Apr. 22, 2024) available at https://sigmadefense.com/press-release/driving-innovation-sigma-defense-expands-cjadc2-capabilities -with-ewa-acquisition/.

133.    In addition to Sigma Defense's acquisition of EWA, Sigma Defense has also acquired a number of other companies that develop and produce a variety of Command, Control, Computers, Communications, Cyber, Intelligence, Surveillance, and Reconnaissance ("C5ISR") systems and solutions.  In October 2025, for example, Sigma Defense acquired Aries Defense, a company that specializes in tactical video and sensor integration, with a focus on capturing and distributing UAV and unattended sensor data for real-time situational awareness. *See* "Sigma Defense Acquires Aries Defense to Expand Tactical Edge ISR and CJADC2 Capabilities," Sigma Defense Press Release (Oct. 13, 2025), *available at* https://sigmadefense.com/press-release/sigma-defense-acquires-aries-defense-to-expand-tactical-edge-isr-and-cjadc2-capabilities/.  Aries Defense provides various sensor and integration solutions to UAV manufacturers that regularly test their systems at WSMR.

134.    SRS is therefore directly affiliated with contractors that develop, produce, and sell the very systems, products, and technologies that will be tested and evaluated under this contract. SRS cannot be objective in testing systems that include components and subcomponents developed and produced by SRS's JV members and their affiliates and subsidiaries.

27

135.    Yet in awarding the contract to SRS, the Army never questioned whether SRS had an impaired objectivity OCI; only after receiving TRAX's protest did the Army conduct any sort of OCI investigation and analysis.

136.    The Army's mid-protest OCI investigation, though lengthy in appearance, was incomplete, unreasonable, and irrational.

137.    Rather than conducting an independent, fact-driven inquiry, the Army relied almost entirely on SRS's and EWA's self-serving and incomplete product lists and declarations, despite acknowledging significant credibility concerns with that information.

138.    The Army specifically questioned the credibility of self-serving declarations submitted by ███████████████████████████████████ at Systems Application & Technologies, Inc. ("SA-TECH")—the managing member of SRS; and ███ ██████████ of EWA Warrior Services, LLC.

139.    According to the Army, the stark similarities in ████████ and ███████ declarations "bring[s] into question the credibility of each Declaration." Ex. 11 at 12-13; *see also id.* at 4-5 (noting the declarations are "highly similar in structure and format and even contain the same editing errors"), *id.* at 8 & 117 (describing "follow-up questions" related to the similarities in the declarations); *id.* at 10 (███████ confirming that he "received his direction from ██████████ regarding the Declaration response" and that both declarants "saw one another's final versions"); *id.* (noting that certain statements in the declaration "didn't fully align with" other statements).

140.    Despite these well-founded concerns, the Army nevertheless relied on these declarations as the primary basis for its conclusions. That reliance was arbitrary and unreasonable.

141.    The Army also failed to interview the agency personnel most knowledgeable about testing activities and failed to review readily available information directly relevant to the OCI issues.

142.    The Army never asked or answered the basic question whether any product, or subsystem developed or produced by SRS's JV members or their affiliates, has been integrated into systems tested at WSMR.

143.    Instead, the Army accepted ███████ obviously incomplete statement that

█████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 11 at 6. ██

██████ never said whether Sigma Defense or EWA (or other Sigma Defense subsidiaries) produce any of the "subsystems, sensors, and related components" that indisputably are tested at WSMR. The Army, for its part, never closed the obvious gap in ████████ explanation.

144.    The Army also unreasonably focused its analysis on a list of purchases by SRS of EWA and Sigma Defense products, which is not representative of the products and subsystems tested at WSMR. The WSMR MSS contractor does not purchase all systems tested at WSMR, and, even if it did, those purchase records would not reflect subsystems, parts, and software that are not delivered separately but are integrated into a system.

145.    The Army asked EWA for list of all parts delivered to DOW customers, but again that list does not reflect subsystems, parts, and software that are not delivered separately but are integrated into a delivered system.

146.    The Army never asked for a list of all systems tested at WSMR in the last several years, or whether Sigma Defense, EWA, or any other Sima Defense subsidiaries developed or produced components for that system.

147.    Based on data it did receive, the Army determined that EWA Warrior Services, its subsidiary EWA Government Systems, and Sigma Defense, made ███████ to DOW customers since 2024. *See id.* at 8. Of the ███, ████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████

148.    ████████████████████████████████████████████████████ ███████; however, the Army was unable to locate any evidence indicating that SRS personnel were involved in the testing. *Id.* at 123.

149.    The Army determined that SRS's failure to notify the Army of these undeniable connections and the potential OCI they create constituted a violation of SRS's OCI notice obligations under the incumbent contract.

150.    Nevertheless, because the Army concluded that SRS had not been involved in the testing of these systems at WSMR, the Army determined that SRS did not have an impaired objectivity OCI. That conclusion is fatally flawed because it rests on a clearly incomplete account of the subsystems and components produced by SRS's affiliates that have been tested at WSMR.

151.    But even if it is the case that SRS personnel were not involved in the testing of these systems, the Army's investigation clearly shows a significant potential that SRS will be called on to test products and subsystems manufactured by SRS's JV members and their affiliates, which products and subsystems indisputably are being sent to WSMR for testing.

152.    The Army never considered whether or how SRS can mitigate this OCI going forward. The Army's analysis only confirmed that the Army cannot rely on SRS to identify these OCIs in the first instance.

153. The Army's failure to conduct a proper OCI evaluation prejudiced TRAX, because a reasonable OCI analysis would have resulted in SRS being found ineligible for award or would have materially altered the competitive standing of offerors.

154. For these reasons, the Army's actions were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

TRAX respectfully requests that the Court declare that the Army's evaluation and source selection decision were arbitrary, capricious, an abuse of discretion, and not in accordance with law. TRAX further requests that the Court issue a permanent injunction directing the Army to properly reevaluate the proposals before making a new source selection. TRAX further requests that this Court award TRAX the costs that it incurred in pursuing this action and provide such other relief as the Court deems just and appropriate.

s/ Daniel P. Graham
Daniel P. Graham
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202-756-8890
dgraham@mcdermottlaw.com

*Lead Attorney for Plaintiff*
*TRAX International Corporation*

*Of Counsel:*
Tara L. Ward
Emily E. Fallin
MCDERMOTT WILL & SCHULTE LLP

Date:  May 29, 2026

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2026 I caused a copy of the foregoing document to be electronically filed with the clerk using the Court's CM/ECF system. I further certify that I have served the foregoing document via Electronic Mail on the following:

United States Department of Justice
Commercial Litigation Branch
Civil Division, 8th Floor
1100 L Street NW
Washington, DC 20530
E-mail: nationalcourts.bidprotest@usdoj.gov

s/ Daniel P. Graham
Daniel P. Graham
MCDERMOTT WILL & SCHULTE LLP