**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

|   |   |   |
|---|---|---|
| TRAX INTERNATIONAL CORPORATION | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 26-796 |
| THE UNITED STATES, | ) | Judge Carolyn N. Lerner |
| Defendant, | ) | |
| and | ) | |
| SOUTHWEST RANGE SERVICES, LLC | ) | |
| Defendant-Intervenor. | ) | |

**TRAX'S MOTION TO COMPLETE THE ADMINISTRATIVE RECORD**

Pursuant to the Court's June 17, 2026 Scheduling Order and Rules 7, 52.1, and Appendix C, Paragraphs 22 and 25 of the Rules of the United States Court of Federal Claims, Plaintiff, TRAX International Corporation ("TRAX"), moves the Court to issue an order directing the Government to complete the Administrative Record by producing:

1.  All documents generated by or for any artificial intelligence ("AI") tools used by the Army to evaluate or compare proposals received in response to Request for Proposals No. W51EW725RA003 (the "RFP"), including the "outputs" for each offeror of the "AI tool" that is referenced in Paragraph 4 of the June 16, 2026 Declaration of ███████████.

2.  All documents memorializing the Army's consideration of any outputs from any AI tool used to evaluate or compare proposals under the RFP, including all documents memorializing the Army's determination that those outputs were not usable.

"A motion to complete the administrative record seeks to add materials that are relevant to the challenged agency decision and that were *considered* by the agency in reaching its decision *or generated* during the decision-making process." *Competitive Innovations, LLC v. United States*, 175 Fed. Cl. 296, 303 (2025) (emphasis added) (citing *BHB Ltd. P'ship v. United States*, 147 Fed.

Cl. 226, 229 (2020). The standard is disjunctive: "While an administrative record is typically presumed to be complete, the presumption of regularity may be rebutted by 'clear evidence of material that was *generated or considered* by the agency but excluded from the record.'" *Id.* (emphasis added ) (quoting *BHB*, 147 Fed. Cl. at 229); *accord Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 167 (2011) (asking whether documents were "generated by the [agency] during the procurement process or considered by it as part of its overall decisionmaking"). "A proper administrative record 'is not limited to documents relevant only to the merits of the agency's decision' but also 'includes documents and materials relevant to *the process of making the agency's decision.*'" *Oak Grove Technologies, LLC v. United States*, 156 Fed. Cl. 594, 600 (Fed. Cl., 2021) (emphasis in original).

There is no dispute that the Government used AI to perform an assessment of the proposals submitted in response to the RFP. According to the June 16, 2026 Declaration submitted by Source Selection Evaluation Board ("SSEB") Chairperson ▮▮▮▮▮▮ the entire SSEB convened to review the results of one such assessment, which a procurement analyst displayed on a projection screen. Ex. 1 ¶ 4. Mr. ▮▮▮▮ declares: "After reviewing the AI output for Offeror A's proposal, I and the other SSEB members concluded that the results were not usable and could not be used as a reliable tool." *Id*. Mr. ▮▮▮▮ states that he and the SSEB did not review the outputs for Offerors B (TRAX) and C (Defendant-Intervenor Southwest Range Services, LLC). But he appears to acknowledge that similar outputs were created for each offeror.

The AI "outputs" are necessary to complete the record because they were "generated" by the Army specifically for this procurement, *Competitive Innovations*, 175 Fed. Cl. at 303, and because they are relevant to the "process" by which the Army made its decision, *Oak Grove*, 156 Fed. Cl. at 600. Mr. ▮▮▮▮ does not say who at the Army directed a procurement analyst to

2

"process" proposals using an AI tool, but his Declaration makes clear that the procurement analyst captured the "outputs" of that AI tool in a document that was presented to the SSEB. The SSEB convened, in person, to review those outputs and deliberated whether the outputs should be used further in the SSEB's evaluation. Whatever further use the SSEB chose to make or not make of those AI outputs, they were documents that were generated specifically for this procurement, and specifically to reflect the comparative merits of the proposals received in response to the RFP.

"[A]n agency may not exclude information merely on the grounds that it did not rely upon the excluded information when reaching a final decision when there was evidence that the information was, in fact, reviewed." *Comint Sys. Corp*, 100 Fed. Cl. at 168; *accord Hager Dev. Grp., LLC v. United States*, No. 20-819, 2020 WL 4529817, at *4 (Fed. Cl. Aug. 5, 2020) (ordering the inclusion of reports that were only "suggestions" for agency decisionmakers because the documents "add meaningful context" to the agency's decision).

> "Critically, the Justice Department advises agencies to include in the record 'documents and materials' (1) whether they 'support or do not support the final agency decision,' (2) that either 'were before *or available to* the decision-making office at the time the decision was made,' and (3) that 'were before the agency at the time of the challenged decision, *even if they were not specifically considered by the final agency decision-maker.*'"

*Oak Grove*, 156 Fed. Cl. at 600 (quoting U.S. Dep't of Justice, Env't & Nat. Res. Div., Guidance to Federal Agencies on Compiling the Administrative Record at 2 (Jan. 1999)) (emphasis in *Oak Grove*).

If the Army did not, in fact, rely on the AI outputs, that deliberate decision was made only *after* reviewing and considering those documents, and concluding based on that review that the documents should not be relied upon. Whether the documents support the Army's award decision, undermine the Army's award decision, or neither has no bearing on whether they belong in the

3

administrative record—all that matters is that they document part of the process that the Army used to make that award decision and reflect the information that was before the Army as it made that decision. Indeed, whether the Army reasonably placed weight on certain aspects of the record over others is a critical issue in any proceeding on an administrative record. *Motor Vehicle Mfrs. Ass 'n of US., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (analyzing whether, *inter alia*, the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for [his] decision that runs counter to the evidence before the agency").

Mr. ▇ says the documents were not "usable," but he does not say why. Ex. 1 ¶ 4. Counsel for the Government asserts in the Parties' June 16, 2026 summary of their dispute that "the AI's output was not accurate," but he does not say why. Ex. 2 at 3. And at the June 8, 2026 Status Conference, Counsel for the Government stated that the SSEB chose to disregard the AI outputs in part because the AI tool "did not produce results consistent with what the evaluators did." ECF No. 23 at 10:22-23; *accord id.* at 9:19-20 (stating that the AI results were "inconsistent with the work that was done by the Government"). To the extent that the AI documents contradict the SSEB's findings, that cannot be a basis on which to exclude them from the Administrative Record. *Comint Sys.*, 100 Fed. Cl. at 168 ("The court's review function is undermined when an agency assembles a record that consists solely of materials that insulate portions of its decision from scrutiny or that it deems relevant to specific allegations raised by a protester.").

The Government denied in the Parties' June 16, 2026 letter to Chambers that the AI documents were generated "during the procurement." Ex. 2 at 3. The Government asserts that "The AI allegedly used 'during the procurement' was decidedly out of the Army's evaluation process given that the [SSEB] only saw the AI output on one proposal *after* the SSEB had already evaluated that proposal." *Id*. The Government's reasoning is flawed for at least three reasons:

4

- *First*, Mr. ▮▮▮ does not say when the AI outputs were generated. He says: "After completing the evaluations for Offeror A, a procurement analyst showed us on a projector screen the output of an AI tool that *had processed* a copy of Offer's [sic] proposal." Ex. 1 ¶ 4 (emphasis added). Mr. ▮▮▮ Declaration indicates that the AI outputs were generated before the SSEB completed its evaluation, and then presented to the SSEB.

- *Second*, the SSEB's in-person deliberations occurred between July 21, 2025 and August 1, 2025, and are identified in the SSEB's Report as the SSEB's "Initial Evaluations." AR Tab 261 at 5047. The SSEB's evaluations continued through September 3, 2025, resulting in the drafting and finalization of consensus ratings. *Id.* The SSEB then generated multiple drafts of its Report, and the Final SSEB Report was not signed until January 28, 2026, *months* after initial evaluations were conducted. It therefore does not appear accurate to state that the SSEB "completed" its evaluation prior to reviewing the AI outputs. Instead, it appears that the SSEB reviewed a portion of the results generated by the AI tool, and chose to disregard those results, after the SSEB made its initial evaluation findings, but long before the SSEB's evaluation was complete.

- *Finally*, even if the SSEB's review was conducted after it completed its evaluation, a complete Administrative Record necessarily includes documents that are created subsequent to the agency decision being challenged. Indeed, the Core Documents in any bid protest include a variety of post-award documents such as debriefings. RCFC App. C ¶ 22(r)-(u). The Administrative Record in this protest includes dozens of documents created by the Army after the Source Selection Decision and before TRAX's GAO protest.

The AI documents are therefore part of the process that the Army followed in evaluating proposals and making its source selection decision, and the administrative record is incomplete without them.

Finally, the AI Documents are directly relevant to TRAX's claims, and the record indicates that the Army's use of AI did bleed into the evaluation materials that were provided to the Source Selection Authority. The Army conceded at GAO that the sole weakness assigned to TRAX's proposal was assigned in error; however, the Army has never attempted to explain how that error occurred. The weakness under Subfactor 1B, Continuity of Operations, stated:

[REDACTED].

AR Tab 261 at 5073. Pages 32-38 of TRAX's proposal contain TRAX's response to Subfactor 1A, *not* Subfactor 1B. This is clear from TRAX's Table of Contents. AR Tab 146 at 2365. TRAX's response to Subfactor 1B was set forth in pages 49-74 of TRAX's proposal. *Id.* at 2365-66.

"Mirroring" is referenced once in TRAX's proposal, on page 32, as part of TRAX's response to Section [REDACTED] of the RFP—not M.4.1.3.3., as referenced in the weakness:



*Id.* at 2672. Section M.4.1.2.2 of the RFP stated that the Army would "evaluate the Offeror's proposed organizational and management structure." Table 6 from TRAX's proposal simply illustrates how TRAX's organizational and management structure mirrors WSMR's structure.

[REDACTED]

Nothing in TRAX's proposal indicates that Table 6, or anything on pages 32-38 of the proposal, represents TRAX's response to Subfactor 1B, let alone Section M.4.1.3.3.

Instead, TRAX's response to Subfactor 1B was set forth in pages 49-74 of TRAX's proposal. *Id.* at 2689-714. Specifically, Section M.4.1.3.3 of the RFP stated that the Army would evaluate an offeror's "approach for realignment of incumbent personnel to minimize interruption of services or delays in work progress that could potentially impact the overall mission," and how an offeror "proposes to capture efficiencies in knowledge transfer and workload transfer to ensure successful mission execution during the phase-in period." TRAX's response to Section M.4.1.3.3 was set forth on pages 69-70 of TRAX's proposal, under the heading, "Approach to Realignment of Incumbent Personnel Including Knowledge Transfer and Workload Transfer (L.4.1.2.3; M.4.1.3.3; PWS 1.20.6)." *Id.* at 2709-10.

The weakness assigned to TRAX's proposal therefore bears many of the hallmarks of an AI hallucination—incorrect citations to pages in TRAX's proposal that have no bearing on the evaluation factor at issue, and that conflate entirely separate aspects of the evaluation. *See, e.g., United States v. Hayes,* 763 F.Supp.3d 1054, 1064-65 (E.D. Cal. Jan. 17, 2025) (describing the hallmarks of citations generated by AI). Given that the Army has conceded that it used an AI tool to evaluate proposals, the documents generated by and for that tool should be included in the record so that the Court can meaningfully review the extent to which the Army's use of AI impacted the Army's evaluation findings and source selection decision.

WHEREFORE, TRAX respectfully requests that the Court order the Government to complete the Administrative Record by producing:

1.  All documents generated by or for any artificial intelligence ("AI") tools used by the Army to evaluate or compare proposals received in response to Request for

7

Proposals No. W51EW725RA003 (the "RFP"), including the "outputs" for each offeror of the "AI tool" that is referenced in Paragraph 4 of the June 16, 2026 Declaration of ███████.

2.      All documents memorializing the Army's consideration of any outputs from any AI tool used to evaluate or compare proposals under the RFP, including all documents memorializing the Army's determination that those outputs were not usable.

Respectfully Submitted,

s/ Daniel P. Graham
Daniel P. Graham
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street, N.W.
Washington, DC 20001
202-756-8890
dgraham@mcdermottlaw.com

*Lead Attorney for Plaintiff*
*TRAX International Corporation*

*Of Counsel:*
Tara L. Ward
Emily E. Fallin
MCDERMOTT WILL & SCHULTE LLP

Date:  June 22, 2026