[redacted]

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

Redacted Version

TRAX INTERNATIONAL CORPORATION, )
)
Plaintiff, )
)
v. )
) No. 26-796C
THE UNITED STATES, )
) Judge Carolyn N. Lerner
Defendant, )
)
and )
)
SOUTHWEST RANGE SERVICES, LLC, )
)
Defendant-Intervenor. )

**CONSOLIDATED RESPONSE TO ORDER TO SHOW CAUSE**

Pursuant to the Court's order of September 11, 2026 (ECF 74), defendant, the United States, respectfully provides this response to the Court's order to show cause. The order directs the "Department of Justice ("DOJ") and the Department of the Army [to] **SHOW CAUSE** why they should not be sanctioned for factual misrepresentations in the Government's briefs and declarations." Order at 6. We explain below why the Department of Justice (DOJ) and the Department of the Army (Army) should not be sanctioned in this matter. DOJ and Army counsel respectfully submit that the issues associated with the administrative record (AR) in this case were unintentional, we sincerely regret and apologize for any inconvenience these issues have caused.

Below, in the Introduction, we provide an overview of the Court's order to show cause and counsels' earnest responses to it. The Further Investigation section addresses the significant investigation the Army and DOJ have undertaken since learning of the Court's intention to order the DOJ and Army to show cause. Finally, we address the Court's sanctioning authority and

[redacted]

answer the nine questions from the Court's September 11, 2026, Order. In support of our position that DOJ and Army should not be sanctioned, we rely on the following brief, and three accompanying Exhibits.

**INTRODUCTION**

On August 19, 2026, this Court mentioned the possibility of sanctions against the DOJ and Army. Since that time, DOJ and the Army have collectively invested hundreds of hours investigating this matter, and we now know that a misunderstanding of one aspect of the evaluation process at the beginning of this case led DOJ and Army counsel to assume certain matters that resulted in erroneous filings. In sum, DOJ and Army counsels' failure to immediately realize or connect the dots that [redacted] and [redacted] were SSEB members who *did* evaluate certain aspects of the offers, was the root cause that resulted in these downstream problems. The investigation has been a humbling learning experience for all DOJ and Army counsel. No DOJ and Army counsel involved in this case is excusing his or herself for failing to realize that the people that received the AI material were SSEB members. However, it is also true that no DOJ and Army counsel involved in this case were aware of these failures and hiding them from the Court. Indeed, all DOJ and Army counsel on this case learned of the issue for the first time on August 19, 2026, at the Court's hearing on the parties' respective motions for judgment on the administrative record. Nonetheless, the United States apologizes for these circumstances, the unnecessary proceedings they have engendered, and the costs (time and money) borne by the Court and the parties.

The Court's order to show cause states that the Government's response to Trax International Corporation's (TRAX) motion to complete the record maintained "that no AI-generated documents were viewed or relied upon by the Source Selection Evaluation Board

[redacted] ("SSEB") or other members of the Army procurement team." *See* ECF 74 at 1 (Order) (citing Def. Resp. to Mot. to Complete at 3, ECF 32.). The Court subsequently granted TRAX's motion to complete the record as to [redacted] "since the SSEB had in fact reviewed the AI evaluation of [redacted]'s proposal." *Id.* at 2. The Court then posed three additional questions to Procurement Analyst [redacted] and SSEB Chair [redacted], to which the Government responded with supplemental declarations. *Id.* at 2-3. Both [redacted] and [redacted]'s initial and supplemental declarations generally stated that AI output had not been provided to SSEB members beyond a limited visual disclosure. Those were errors. Even though the technical AI output [redacted] and [redacted] received was not relevant to them because they were not technical SSEB evaluators, DOJ and Army counsel recognize and appreciate that the declarations contained errors.

DOJ and Army counsel take this matter very seriously. The Department of the Army (Army) attorneys have [redacted].[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

Despite transgressions, counsel for the Department of Justice (DOJ) and the Army believe they should not be sanctioned and respectfully offer the following response in support.

**FURTHER INVESTIGATION**

Prior to opposing TRAX's motion to complete the record, Army and DOJ counsel conducted extensive interviews with key personnel, specifically: [redacted], [redacted], [redacted], [redacted], [redacted], and [redacted]. In response to this Court's order to show cause, the Army and DOJ conducted interviews with: [redacted], [redacted], [redacted], [redacted], [redacted], and [redacted]. What follows, unless otherwise cited, is derived from that collection of interviews, and review of the interviewees' emails.

The evaluation process for White Sands Missile Range (WSMR) Mission Support Services (MSS) acquisition began on Monday, July 21, 2025, at Fort Sam Houston in San Antonio, Texas. There were four parts to the Source Selection Evaluation Board's (SSEB) evaluation of the WSMR acquisition: 1) Technical / Mission Capability; 2) Past Performance; 3) Small Business Participation; and 4) Cost/Price. AR2142. From witness interviews we know that two parts of the SSEB, the technical and past performance evaluators, traveled to San Antonio for the evaluations, while two parts, the cost and small business evaluators, did not.

In San Antonio, the technical evaluation team (TET), including [redacted] (SSEB Chair), worked in Building 613, while the past performance team— including [redacted] (Past Performance Chair) and [redacted] (Past Performance Evaluator)— conducted their

[redacted]

evaluations in Building 603.[2] While doing their independent individual evaluations the TET members worked on individual laptops and were given a WORD document to fill in, as well as access to a PDF copy of the Offeror's proposal.

On Thursday, July 24, 2025,[3] the members of the TET sent [redacted] their individual evaluations for [redacted] by email. After receiving individual submissions from all four TET members, [redacted] walked from Building 603 to Building 613 to take notes during the consensus discussion led by [redacted].[4]

Prior to Thursday, July 24, 2025, [redacted] that he used the AI tool FAST TRACK to generate a technical evaluation for [redacted].[5] During our further investigation, we learned for the first time that [redacted] briefly demonstrated the tool to [redacted], [redacted], and [redacted] [redacted][6] prior to presenting it to the TET. Then, prior to traveling approximately 500 feet from Building 609 to Building 613, [redacted] emailed the technical AI output for [redacted] to [redacted]

---

[2] Building 613 and 603 are both contained within the "Long Barracks" building; however, the barracks is a large structure with separate exterior access codes for each building, thereby preventing movement between evaluation areas without specific authorization. The two teams were located roughly one-eighth of a mile apart.

[3] All the witnesses interviewed about this process stated that the first technical evaluation (of [redacted]) took the longest time because everyone had to familiarize themselves with the requirements and the proposal format. All the witnesses interviewed also stated this extended time for the first offeror's evaluation is normal.

[4] According to the witness, in a "consensus discussion" TET members compare their ratings in various areas, and where there is disagreement amongst the members, they work to reach consensus. Based on our interviews, we understand this process to be comparable to a jury reaching a verdict.

[5] According to [redacted], the only material he input into FAST TRACK throughout this procurement was the solicitation and the technical portions of the proposals of Offerors A, B, and C. No other portions of the offerors' proposals were entered into FAST TRACK.

[6] According to [redacted], she supervises [redacted] and [redacted].

[redacted]

as a back-up in the event his laptop was unable to project the FAST TRACK output on a larger screen in Building 613.

[redacted] was able to project the FAST TRACK material for [redacted] and after reviewing FAST TRACK's AI-generated technical analysis the TET, [redacted], [redacted], and [redacted] [redacted] concluded FAST TRACK's technical AI output was not reliable.

Subsequently, [redacted] states that he did not email or otherwise provide physical or electronic copies of the technical AI output for [redacted] to anyone else, meaning only he and [redacted] [redacted] had copies. Similarly, [redacted] states the AI generated technical output for [redacted] stayed in her email.

On Monday, July 28, 2025, week two of the TET, [redacted] states he generated an AI-based technical evaluation for Offeror B. [redacted] states that this AI-generated output was emailed to [redacted] [redacted], and [redacted] on that same day. In that email, [redacted] stated that this output looks "slightly different from the MS Word output" shared the week prior. Exhibit A. He explained that for this iteration, he "was able to get the AI tool to assemble the document and automatically export it to MS Word." *Id.* [redacted] further clarified that, for the [redacted] technical output he "had to manually cut/paste text into a separate document" so he created his own headings for organizational purposes. *Id.* [redacted], [redacted], and [redacted] [redacted], in our interviews, all maintain that they did not download, save, or maintain the AI generated output for Offeror B in any way other than in their individual emails. They also state that they did not forward it or provide it to anyone else.

On Tuesday, July 29, 2025, according to [redacted], he generated an AI-based technical evaluation for Offeror C, and again emailed it to [redacted], [redacted], and [redacted] on that same day. Again, [redacted], [redacted], and [redacted] all maintain that they did not

[redacted]

download, save, or maintain the AI generated output for Offeror C in any way other than in their individual emails. They also state they did not forward it or provide it to anyone else.

Everyone we spoke to regarding these events – including [redacted] (TET), [redacted] (TET), [redacted] (Past Performance), and [redacted] (Cost/Price & Past Performance) - maintain that they did not utilize any of the AI material in the technical team evaluations. As part of the normal contract review board process, all evaluations are reviewed and our further investigation into this matter confirmed there is no evidence that the TET saw, received, or had knowledge of the AI output for Offerors B and C.

With respect to the similarities between the TET's evaluation and the AI output of [redacted]'s transition schedule, the solicitation told the offerors in Section L.4.1.2 and L.4.1.2.1 to "describe a transition schedule to include milestones on how it proposes to become fully operational within the required 90-day phase-in period." AR1823. Section M.4.1.3 and M.4.1.3.1 informed offerors that the Army would evaluate their transition approach "for assuming full contractual responsibility without disruption or degradation of performance during the transition period, to include identification of risks and proposed mitigation strategies." *Id.* In those same sections, the solicitation further informed offerors that the evaluation would include their "milestones on how it proposes to become fully operational within the required 90-day phase-in period." *Id.*

Language like the above appears in [redacted]'s proposal, and we found similarities in language with one evaluator, [redacted].[7] Prior to having any knowledge of the AI generated output, [redacted] wrote:

[7] As mentioned above, upon notice of the pending Order to Show Cause, the Army and DOJ began further investigation to better determine the events underpinning the Court's order to

[redacted]

[redacted]

Exhibit B at 15. According to [redacted] and [redacted], [redacted] emailed his deliberative draft evaluation to the contracting team prior to [redacted] displaying the technical AI output summary for [redacted] to the TET. While [redacted]'s individual deliberative draft evaluation language is like the AI output, we believe much of the language comes directly from [redacted]'s proposal, which [redacted] told us he had access to while evaluating [redacted]. For example, Figure [redacted] specifically lists, among other things, [redacted] as risks that [redacted] self-identified along with their mitigation strategies for each. Exhibit C at 67-69.[8] Each of these are expounded upon in the proposal in greater detail. *Id.* at 67. Given the language in the solicitation and in the proposal, as well as counsels' conversation with [redacted], it appears that both the human evaluator ([redacted]) and AI evaluation tool relied on the same information in [redacted]'s proposal to identify the [redacted].

With respect to the similarities between the technical team's evaluation and the AI output of [redacted]'s [redacted] staffing plan for phase-in, the solicitation told the Offerors in Section L.4.1.2.2 to describe their "staffing plan for the phase-in period, to include identified and qualified resources available on hand to immediately begin performance upon contract award."

show cause. To that end, the Army applied significant resources to review TET evaluation drafts to identify the genesis of the similar language.

[8] Page numbers refer to the PDF page number, not the proposal page number.

[redacted]

AR1823. Further, Section M.4.1.3.2 informs offerors that their phase-in staffing plan will be evaluated

> to include identified and qualified resources available on hand to immediately begin performance upon contract award. The Government will evaluate the Offeror's detailed approach on how it plans to ensure availability of trained and qualified personnel in the event resources are unavailable when needed.

AR1837. One TET member, [redacted], wrote an individual finding in his deliberative draft evaluation which morphed – after he submitted his evaluation[9] – through review and revision into language very similar to [redacted]'s technical AI output. That initial deliberative draft evaluation originally stated:

> [redacted]'s Staffing Plan [redacted]

Exhibit B at 16. We acknowledge that some of this language appears to be traceable to [redacted]'s proposal and the solicitation. For example, [redacted]'s proposal describes their staffing approach as "[redacted] Exhibit C at 12; 74-75. Similarly, the discussion of verification of [redacted] upon contract award appears to be language pulled directly from the solicitation. *Id.* at 74. However, DOJ and the Army recognize that the human evaluation being virtually identical to the [redacted] technical AI output suggests copying, not similar paraphrasing.

[9] And [redacted] emailed his finished deliberative draft evaluation to the contracting team prior to [redacted] displaying the technical AI output summary for [redacted] to the TET.

[redacted]

Thus, DOJ and the Army recognize the significant possibility that the language in question was adopted directly from the [redacted] FAST TRACK AI outpoint into the [redacted] portion of the SSEB report. While the TET, [redacted], [redacted], and [redacted] were present when [redacted] displayed the AI output on the screen, counsel believe it unlikely anyone could almost identically replicate that language after only viewing a screen shot for a brief period. Additionally, our further investigation does not change our previous understanding that only [redacted] and [redacted] had access to the written [redacted] technical AI output, while only [redacted], who did not have access to the [redacted] AI output, was involved in compiling the evaluation document during the editing process after the TET reached its consensus. In our further investigation, all participants in these events reiterate that they did not utilize the AI output.

**THE COURT'S SANCTIONING AUTHORITY**

Two standards exist in Federal courts when a trial court orders sanctions *sua sponte*: the bad faith standard and the objective reasonableness standard. *See 1-10 Indus. Assocs., LLC v. United States*, 528 F.3d 859, 865-66 (Fed. Cir. 2008) (noting a "split in authority exists over whether an element of bad faith or intent is required to support sanctions when the inquiry is initiated by the court"). As the Court stated in its Order, "a failure to conduct a reasonable inquiry before making representations to the Court is independently sanctionable[,]" and this includes "a reasonable inquiry into statements alleged in papers filed[.]" ECF 74 at 5 (citing *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997); *Multiservice Joint Venture, LLC v. United States*, 85 Fed. Cl. 106, 112 (2008)).

The Federal Circuit reviews an order of Rule 11 sanctions under an abuse of discretion standard. *See 1-10 Indus.* 528 F.3d at 867. The Federal Circuit has found that a court abuses its

[redacted]

discretion if the order imposing sanctions is based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1354 (Fed. Cir. 2003) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

**QUESTIONS TO BE ADDRESSED**

The DOJ and Army counsel jointly provide the following responses to the Court's nine questions.

**(1) Identify, by name and role, the individual(s) responsible for generating the incomplete Administrative Record.**

The Court held the Joint Preliminary Status Conference (JPSC) for this case on June 8, 2026. Due to the parties not agreeing to a preliminary injunction, and a contract start date of September 1, 2026, the Government agreed to an accelerated AR production and briefing schedule to forego the additional work of separate preliminary injunction briefing. Thus, the over 9000-page AR was finalized and produced to Plaintiff and Defendant Intervenor on June 12, 2026, four days after the JPSC.

The Army MICC personnel, [redacted] and [redacted], assembled the AR over the course of eight calendar days, beginning on the date they received the initial pre-filing notice, May 27, 2026. They then provided the draft AR to the Army KLIP on June 4, 2026.

The following Army attorneys reviewed the draft AR before providing it to DOJ Trial Attorney [redacted] on the evening of June 9, 2026:

[redacted], Trial Team 1 Chief, Contract Litigation and IP Division, OGC;

[redacted], Senior Trial Attorney, Trial Team 1, Contract Litigation and IP Division, OGC;

[redacted], Trial Team 1, Contract Litigation and IP Division, OGC; and,

[redacted]

[redacted], Attorney-Advisor, 418th Contract Support Brigade, Fort Sam Houston, TX.

When DOJ received the draft AR, it was hundreds of separate documents that needed to be reviewed, assembled and bates numbered. Upon receiving the AR around 6 PM on June 9, 2026, undersigned counsel worked to complete the AR by the June 12, 2026, deadline, serving the AR on Plaintiff, Defendant-Intervenor, and the Court by approximately 11 PM on June 12, 2026.[10] [redacted] Acting Deputy Director at National Courts, is the supervising attorney on this case and consulted when questions arose.

**(2) Explain why the FAST TRACK documents were originally omitted from the Administrative Record.**

DOJ and the Army originally omitted the documents from the Administrative Record because, after discussing AI's role in the evaluations with the contracting team, our position was "that FAST TRACK was not at all involved in this solicitation's evaluations" and therefore was not "relevant to the agency decision" under *Competitive Innovations, LLC v. United States*, nor "developed and considered by the agency" under *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997) (citation omitted). ECF 32 at 3, fn. 3 ("FAST TRACK was not at all involved in this solicitation's evaluations."); *see* 175 Fed. Cl. 296, 303 (2025) ("A motion to complete the administrative record seeks to add materials that are relevant to the challenged agency decision *and that were considered by the agency* in reaching its decision or generated during the decision-making process.") (emphasis added).

[10] Undersigned counsel spent 14 hours finalizing the AR on June 12, 2026.

[redacted]

Upon the Court ruling that the AI material was necessary to complete the administrative record, *see* ECF 38 and the Court's Order dated July 10, 2026, the Government produced all the AI material consistent with the Court's orders.

**(3) Identify, by name and role, every individual who participated in drafting, reviewing, revising, or approving the original declarations by [redacted] and [redacted]**

The AR was produced on Friday, June 12, 2026, without the AI material. On Tuesday, June 16, 2026, the parties submitted a joint letter notifying the Court of a dispute regarding the Administrative Record. The letter was filed with the Court on June 17, 2026, with the original declaration of [redacted] The Court subsequently ordered TRAX to file a motion to complete the administrative record by June 22, with Defendants' responses due by June 26, and TRAX's reply due July 2, 2026. The Government filed [redacted]'s original declaration as an exhibit to our June 26, 2026 response to TRAX's motion to complete the administrative record.

For DOJ, the undersigned counsel reviewed and revised the original declarations by [redacted] and [redacted] based on his conversations with them, as well as discussions with Army counsel; [redacted] reviewed them for format and clarity.

For the Army, the following individuals participated in drafting, reviewing, revising, or approving the declarations by [redacted] and [redacted]

[redacted] Attorney-Advisor, 418th Contract Support Brigade, Fort Sam Houston, TX;

[redacted] Trial Team 1 Chief, Contract Litigation and IP Division, OGC;

[redacted] Senior Trial Attorney, Trial Team 1, Contract Litigation and IP Division, OGC;

[redacted] Trial Attorney, Trial Team 1, Contract Litigation and IP Division, OGC;

[redacted] Chief, Bid Protests, Contract Litigation and IP Division, OGC;

[redacted]

[redacted] and,

[redacted]

Army counsel reminded declarants before signing to confirm all the statements were correct.

**(4) Identify whether agency counsel possessed information at or before the time the original declarations were submitted, indicating that the FAST TRACK documents had been viewed by SSEB members. State why that information was not disclosed to DOJ counsel or corrected before submission.**

On June 10, 2026, Army counsel ([redacted]), along with DOJ counsel, [redacted], had an MS Teams video call, and interviewed [redacted] [redacted] told us that the AI output he generated for offerors B and C had been sent to [redacted] the Contracting Officer (CO), and [redacted], the Contracting Specialist (CS). During the call, [redacted] was able to look through his emails where he discovered that he had emailed a copy of FAST TRACK output for offerors B and C to the CO and CS on July 28 and 29, 2025. At the time, DOJ and Army counsel misunderstood the CO's and CS's roles in the evaluation process and did not recognize that the CO and CS were part of the SSEB. AR1407-08. On that same day, [redacted], [redacted], [redacted], [redacted], [redacted] and [redacted] conducted a second video call to discuss the relevance of the AI output to the Administrative Record. As noted above, the AI output was not included in the Administrative Record because DOJ understood the [redacted] AI output to be irrelevant to the challenged Army's decision and understood the TRAX and SRS AI output were not "considered by the agency in reaching its decision" or "generated during the decision-making process." *See Competitive Innovations*, 175 Fed. Cl. at 303.

[redacted]

**(5) Identify, by name and role, every individual who participated in drafting, reviewing, revising, or approving the supplemental declarations by [redacted] and [redacted].**

On Tuesday, July 7, 2026, the Court ordered the Government to supplement the declarations of [redacted] and [redacted] by Thursday, July 9, 2026. *See* ECF 38. The Government's opposition to TRAX's motion for judgment on the administrative record and cross-motion for judgment on the administrative record was also due on July 9, 2026.

Though DOJ counsel were primarily focused on the Government's other filing in the case due on July 9, 2026, the undersigned counsel reviewed and revised the supplemental declarations by [redacted] and [redacted] based on his conversations with them, as well as discussions with Army counsel; [redacted] reviewed them for format and clarity.

For the Army, the following individuals participated in drafting, reviewing, or revising the supplemental declarations by [redacted] and [redacted]:

[redacted], Attorney-Advisor, 418th Contract Support Brigade, Fort Sam Houston, TX;

[redacted], Trial Team 1 Chief, Contract Litigation and IP Division, OGC;

[redacted], Trial Team 1, Contract Litigation and IP Division, OGC;

[redacted], Chief, Bid Protests, Contract Litigation and IP Division, OGC;

[redacted]; and,

[redacted].

Army counsel reminded declarants before signing to confirm all the statements were correct.

[redacted]

**(6) Identify what investigation, if any, was undertaken before the supplemental declarations were submitted to verify that the AI-generated documents had not been viewed by anyone with decision-making authority.**

The undersigned and Army counsel had numerous extensive telephone and email conversations with [redacted] [redacted] and [redacted] prior to filing the declarations.

Undersigned counsel reviewed a comparison of the AI outputs to the evaluations early in the litigation and determined he did not believe the output – regardless of any similarities – affected TRAX's claims. Similarly, while undersigned counsel believes he was aware no later than June 10 that [redacted] and Ms. [redacted] received the AI material, this did not raise alarms as to the various declarations the Army had provided for the case because I did not understand that [redacted] and [redacted] were members of the SSEB and therefore reviewing the offerors as to past performance and cost/price.[11] Indeed, no parties involved in this matter – to the extent they were aware – raised the issue of [redacted] or [redacted] being members of the SSEB. Thus, I first learned of their roles in the evaluation at the August 19, 2026, hearing on the motions for judgment on the administrative record.

I believe I may have developed the misimpression that [redacted] was not involved in any evaluation because she was not a member of the TET, and the FAST TRACK AI output only applied to TET material. While the initial drafting of the declarations – especially the supplemental declarations[12] – were the work product of the Army, I was aware of what the

[11] Though undersigned counsel reviewed and compiled the administrative record, and drafted numerous briefs in this case, Cost/Price was not an issue raised by TRAX in its protest, and none of the analysis necessary for TRAX's Technical and Past Performance arguments led undersigned counsel to focus on who was doing the evaluating.

[12] The supplemental declarations were due the same day as the Government's response to TRAX's motion for judgment on the administrative record.

[redacted]

declarations said because I reviewed and commented upon them, but, unfortunately, did not comprehend the errors in the declarations when they were filed.

In accordance with the Court's Order, dated July 7, 2026, Army counsel assisted [redacted] in interviewing [redacted], [redacted], [redacted], [redacted], and [redacted] on July 8, 2026. [redacted] confirmed that he had only sent the AI outputs to [redacted] (Offerors B, C), [redacted] (Offerors A, B, C), and [redacted] (Offerors B, C). All three individuals confirmed they did not forward or send that information to anyone else. Also on July 8, [redacted] and [redacted] were present when [redacted] interviewed the SSA, [redacted] [redacted], whose role in this procurement was to exercise his independent judgment in making the source selection decision as the sole decision maker in this procurement (AR1404-05), who confirmed that he had not seen the AI generated documents at issue, nor was he aware of their existence at the time. This information was included in [redacted]'s supplemental declaration.

All Army counsel acknowledge that they limited the "decision-maker" to just the SSA when responding to the Court's July 7th Order to Supplement the Record.[13] Army Counsel understood the term "decision maker" at that time to mean the Source Selection Authority for the procurement consistent with the FAR 15.308, Source Selection Decision, and the Source Selection Plan in the AR. AR1404-05.

**(7) Identify what, if anything, DOJ counsel did between receiving the declarations and the August 19, 2026, hearing to independently verify their accuracy, and what communications DOJ counsel had with agency counsel or the declarants regarding the factual basis for the representations that no SSEB member or decisionmaker viewed or used the FAST TRACK outputs in evaluating proposals.**

[13] Undersigned counsel did not recognize this was the Army's understanding of "decision-maker" until completing the further investigation pursuant to the Court's order to show cause. Had undersigned counsel knew, he would have corrected this misunderstanding.

[redacted]

As described above, prior to receiving any declarations, undersigned counsel participated in separate calls with [redacted], [redacted], and [redacted] that were focused on all events surrounding the Army's use of FAST TRACK, the material FAST TRACK output, and the flow of that material after FAST TRACK output it.

After receiving the declarations, I reviewed and revised them, including clarifying statements within the declarations, such as [redacted]'s understanding of [redacted]'s role, if any, in the procurement, and [redacted]'s understanding of the Army's intentions regarding the use of FAST TRACK. [redacted] reviewed them for format and clarity. As stated previously, I was unaware there were statements in [redacted] and [redacted]'s declarations that were inconsistent with the administrative record prior to the August 19, 2026, hearing, as I did not recognize that [redacted] and [redacted] were members of the SSEB. Because I was not aware of the issues identified by the Court prior to the August 19, 2026, hearing, I did not see the need for further investigation until that day.

**(8) State whether any individual recognized the inaccuracies before oral argument and failed to correct them, and if so, why.**

Neither I, nor Army counsel recognized the inaccuracies before oral argument. Had any counsel recognized any inconsistency with the facts, counsel would have immediately engaged in an expedited further investigation to identify all inconsistencies and make the Court aware of those inconsistencies as soon as possible.

(9) **Explain the overlap in language between the SSEB's evaluation of [redacted]'s proposal and the FAST TRACK summary for [redacted], and address whether the SSEB considered that output in conducting its technical evaluation of [redacted]'s proposal.**

The Court's September 11, 2026, Order highlighted two specific areas of significant overlap which we will refer to as "staffing plan" and "transition schedule," which we provide below.

[redacted]

| SSEB Report, AR Tab 261 at 5059 | FAST TRACK, AR Tab 434 at 9089 |
| --- | --- |
| A07<br>[redacted] - (RFP L.4.1.2.2, M.4.1.3.2, Proposal pg. 44, 67, 74-77):<br>[redacted] | 2. [redacted] Staffing Plan and [redacted] Talent Pool<br>[redacted]<br>RFP Reference: L.4.1.2.2, M.4.1.3.2<br>Proposal Reference: Pages 74-77 |

| SSEB Report, AR Tab 261 at 5059 | FAST TRACK, AR Tab 434 at 9090 |
| --- | --- |
| A08<br>[redacted] - (RFP L.4.1.2.1, M.4.1.3.1, Proposal pg. 69-73):<br>[redacted] | 2. [redacted] in the 90-Day Transition Schedule<br>[redacted]<br>RFP Reference: L.4.1.2.1, M.4.1.3.1<br>Proposal Reference: 69-73 |

*See* Order at 4 ("the SSEB's evaluation of [redacted] contains multiple passages that are nearly identical, sentence for sentence, to the AI-generated evaluation of [redacted]'s proposal."); ECF 53 at 4-5.

Despite our extensive investigation, counsel cannot be certain that the SSEB did not consider the [redacted] AI output in conducting its technical evaluation of [redacted]'s proposal.

[redacted]

Regarding the staffing plan similarities, we agree with the Court that there is overlap between the two paragraphs, but believe this similarity is best explained by [redacted] (a technical evaluator) and FAST TRACK drawing on the same source language found in [redacted]'s proposal (and the solicitation) to form similar paragraphs. [redacted] told us he did not have a copy of the [redacted] AI output, but he did have access to [redacted]'s proposal, and the soliciation.

Similarly, the Government agrees with the Court that there is significant overlap between the two transition schedule paragraphs. Although this similarity could be explained as above, DOJ and Army counsel believe it is significantly more likely that the [redacted] FAST TRACK AI output was adopted into the SSEB report. However, despite extensive further investigation, we are unable to identify how and when this could have occurred.

## **CONCLUSION**

The Government did not withhold the AI material because it thought it in any way threatened the Government's case on the merits, it withheld the material because it believed it was not required to produce it under the law, as articulated by the Federal Circuit in *Axiom* and *AgustaWestland*. *See AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018*)* (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379*)* ("The purpose of limiting judicial review to the record actually before the agency is to guard against courts using new evidence to 'convert the 'arbitrary and capricious' standard into effectively de novo review.'"). Consistently, this Court is asserting Rule 11(b)(3) & (4) sanctions based on factual contentions found not to have reasonable support, not Rule 11(b)(2) sanctions. *See* Order at 5-6. Because the Government does not dispute that there were erroneous (unsupported) factual contentions, the question is whether the Government's inquiry was so unreasonable as to warrant sanctions. *See id.*; Rule 11(b)(3) & (4). The Government counsel read the documents at

[redacted]

issue, conducted an extensive inquiry into the facts and the law, and was satisfied that the filings were well grounded in both, without any improper motive. *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991). In those circumstances, sanctions are unwarranted.

The undersigned counsel understood from the outset of this case that the textual overlap with the AI output for SRS and TRAX was minimal, which is the same conclusion this Court reached. *See* Order at 4. Moreover, I understood the AI output related facts in this case to be that AI output material related to SRS and TRAX did not go to the technical SSEB, or any other decision maker in this case. While I was made aware that the Contracting Officer ([redacted] and the Contracting Specialist ([redacted] received the material, both told me and agency counsel on several occasions that they did not use or forward the material. They reiterated their positions when we went back and interviewed them for this response. The Government believes that, even with the mistakes made, this level of inquiry by the undersigned was reasonable. In contrast, it would have been unreasonable if [redacted] or [redacted]'s status as SSEB members was integral to the merits analysis. That is not the case here.

The Government believes the sanction analysis for Army counsel to be similar. The Army was also aware, like the Court is, that the textual overlap with the AI output for SRS and TRAX was minimal, and the Army made no attempt to hide the material. Indeed, it was the Army who highlighted the issue and provided DOJ the comparison between offerors and the AI material. Moreover, it was the Army – especially 418th Contract Support Brigade counsel, [redacted] – who did extensive investigation into the material facts surrounding the AI use. The Army did this work not to bury the AI output of [redacted], SRS, and TRAX – which the Government produced pursuant to the Court's orders, to no ill effect to the Army – but, like DOJ,

[redacted]

to determine if the material was part of the AR under the applicable case law. While the Army acknowledges the mistakes made, the Army believes its' inquiry was extensive and reasonable.

Here, somehow, numerous Government counsel failed to recognize [redacted] and [redacted]'s roles on the SSEB, with a bad result. But the Government never intentionally withheld documents it believed should be part of the administrative record, and always acted in good faith, attempting to swiftly respond to the Court's orders and provide the requested explanations despite a very compressed and challenging schedule, with myriad other work responsibilities pulling the counsel in all directions. We understand the Court's frustration, and both DOJ and the Army regret the errors and oversights that occurred notwithstanding the good faith intentions of everyone involved with the preparation of the AR and filings, especially the declarations, in this case. For these reasons, we respectfully request that the Court sanction no party.[14]

[14] Should the Court order sanctions, DOJ and Army counsel have both begun discussions with their respective leadership, and TRAX, about paying TRAX's attorney fees associated with TRAX's litigation pertaining to the AI issue. Those discussions are ongoing.

[redacted]

October 5, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

DOUGLAS K. MICKLE
Acting Deputy Director

/s/ Daniel A. Hoffman
DANIEL A. HOFFMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-0547
E-mail: Daniel.A.Hoffman@usdoj.gov

Of Counsel:

[redacted]
Senior Trial Attorney, Team I
[redacted]
Trial Attorney, Team I
Contract Litigation & Intellectual Property Division (KLIP)
Office of the General Counsel, Department of the Army

[redacted]
Attorney-Advisor (Contracts)
418th Contracting Support Brigade
Mission and Installation Contracting Command

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of October 2026, I will cause a true and correct copy of the foregoing Consolidated Response to Order to Show Cause to be served by e-mail on:

Daniel P. Graham
McDermott Will & Schulte, LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
dgraham@mcdermottlaw.com
*Counsel for Plaintiff*

Craig A. Holman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Craig.holman@arnoldporter.com
*Attorney for Defendant-Intervenor*

/s/ Daniel A. Hoffman